HATCHER ET AL V. DAY ET AL.

1. **Conveyance:** RELINQUISHMENT OF DOWER: FRAUD. The fact that a wife signed a conveyance of property to one of her husband's children, as an advancement, with the understanding that it was unimproved land, when it was, in fact, partially improved, will not authorize the cancellation of the deed for fraud, though such understanding upon the part of the wife was induced by the husband, unless it also appears that she would not otherwise have executed it.

2. ——: ———: ———. But where it was represented to the wife by her husband that a conveyance to his son was in pursuance of a sale of the property to the son, and she was induced by such representation to join in the deed, whereas, in fact, the conveyance was largely a gift, it was held that the wife's right of dower in the property was not barred by the execution of the deed.

*Appeal from Lucas Circuit Court.*

THURSDAY, JUNE 10.

ONE Mahlon B. Hatcher died in Lucas county on the 26th day of March, 1876, leaving surviving him, as his widow, Mary K. G. Hatcher, and nine children, to-wit: Rebecca A. Day, Elijah J. Hatcher, Joseph T. Hatcher, and Samuel J. Hatcher, who are made defendants in this action, and J. G. Hatcher, M. A. Hatcher, W. F. Hatcher, Sarah J. Close and Phebe K. Webster, who, with Mary K. G. Hatcher, are made plaintiffs. The object of the action is to secure the cancellation of two deeds, one of one hundred and eighty acres of land near Chariton, in Lucas county, executed by Mahlon B. Hatcher and Mary K. G. Hatcher, to Rebecca A. Day; the other, of a town lot, with hotel thereon, in Chariton, executed by Mahlon B. Hatcher and Mary K. G. Hatcher, to Elijah J. Hatcher. The plaintiff Mary K. G. Hatcher claims that the deeds ought to be canceled as to her, because her signature to the same was obtained by fraud. The other plaintiffs claim that the deeds ought to be canceled as to them, because the grantees took the property in trust for the heirs of the grantor. The defendants Rebecca A. Day and Elijah J. Hatcher make answer and deny the allegations of fraud and the allegations

of trust.   Joseph T. Hatcher and Samuel J. Hatcher made default.   The court sustained Mary K. G. Hatcher's claim, and rendered a decree in her favor in respect to both deeds, and dismissed the petition as to the other plaintiffs.   They appeal.   The defendants Rebecca A. Day and Elijah J. Hatcher also appeal.

*J. C. Mitchell*, for plaintiffs.

*Stuart Bros.*, for defendants.

ADAMS, CH. J.—The evidence in this case is voluminous and conflicting, but we have been greatly aided in the examination of the case by the clear and systematic manner in which it has been presented by counsel.

The history of the transactions involved dates from August, 1864.   At that time Mahlon B. Hatcher, the grantor and ancestor, resided in Cadiz, Ohio.   He had not long before married the plaintiff Mary K. G. Hatcher, as his third wife. No children resulted from the union.   All his nine children, parties to this action, were the children of his first wife.   At the time of his third marriage, he was worth, we think, according to the evidence, about $25,000, about two-thirds of his property being in Ohio, and the remainder in Iowa, consisting of lands.   Previous to that time, it appears that he had advanced large sums in assisting two of his sons, Joseph and Samuel, though this fact, perhaps, is not very clearly established by legitimate evidence.   Soon after his third marriage he conceived the idea of deeding to a portion of his children the greater part of his Iowa lands.   In July, 1864, he executed several deeds for that purpose, his wife, Mary K. G., joining with him.   In August of the same year he executed to his daughter Rebecca A. Day the deed in question, his wife, Mary K. G., joining with him.   The deeds to the children were made by him as gifts or advancements to the children, as his wife well knew.   After the execution of these deeds, Mahlon still remained the owner of valuable property in Ohio.   Subsequently he sold this property and removed to

Iowa, engaging to some extent in farming, and becoming interested, to some extent, in a hardware store, with his son-in-law H. H. Day.

In the meantime he purchased the hotel property in controversy. In 1869, he executed a deed of the property to his son Elijah, his wife joining, with the understanding that the property was sold to Elijah for its full value.

I. We proceed first to inquire whether Mrs. Hatcher's signature to the deed to Mrs. Day was procured by fraud.

1. CONVEY-ANCE : relinquishment of dower : fraud. This deed was executed in Cadiz, Ohio. Mrs. Day was residing in Iowa, and had no knowledge of the deed at the time, nor for a considerable time afterwards. If any fraud was practiced upon Mrs. Hatcher it was practiced upon her by her husband. It is urged with great zeal by her counsel that the object of the conveyance was to defeat her dower right in the property.

The object, of course, and only object of her joining in the deed, was to bar her right of dower. But this she understood. She was not misled in regard to the legal effect of her act, nor does she claim that she was. Nor was she misled in regard to the quantity of land conveyed, the number of acres being expressly stated in the deed. She claims, however, that she was misled and defrauded in regard to the character of the land.

That her husband misled and defrauded her we see very little, if any, evidence except her own testimony. But, under section 3639 of the Code, we think her testimony upon this point is inadmissible. We have, however, looked into it, and we have to say that it fails to satisfy us that her husband was guilty of anything which would amount to fraud, taking her statement as to what he said and did to be true. She says that her husband told her that he was going to give each of his children a piece of wild land. She claims that she signed the deed in question under the supposition that the land described in it was wild land, whereas the fact is that eighty acres of it was under cultivation and fenced, and had a small

house upon it. She does not say that her husband told her that this land was wild. In July previous she and her husband had executed deeds to the children of several tracts of wild land. In August they executed the deed to Mrs. Day, and her husband executed to herself a deed of a tract, both of which she claims she understood were wild, but both contained improvements. It is evident that she acquired her understanding from what was said about the lands deeded in July. It is further evident that the difference between conveying to Mrs. Day improved land instead of unimproved was not a material consideration with her. She said, speaking of the transaction generally, that she knew nothing about it, and cared nothing about it. She knew he was not giving away the Ohio property. From the Iowa property she appears to have been entirely willing that her husband should make gifts or advancements to the children. According to her own testimony she paid no attention to the quantity or value given. Indeed even now it is not insisted that the land conveyed to Mrs. Day was more valuable than she supposed. It was not in fact very valuable with all its improvement. Mr. Hatcher had just purchased it for $3,000, or a little less than $17 an acre. She nowhere says that if she had been told that the land was worth $3,000 she would have refused to join in making so large an advancement. Her statement that she knew nothing about this matter of advancements, and cared nothing about it, satisfies us clearly that she would not have refused. She does say that it is hardly probable that she would have joined, because their living was to come from this land. But with fifteen or twenty thousand dollars worth of other property, she had no reason to think that her husband was depriving himself and her of a living.

Besides, notwithstanding the execution of the deed to Mrs. Day, the use and enjoyment of the property were retained by Mr. Hatcher for twelve years, and until his death. Hatcher and wife made their home upon it awhile, and as long, we judge, as she was contented to live there. When Mrs.

Hatcher joined in the deed, she had reason to suppose that possession of the property would be transferred immediately. The advancement, in the way it was actually made, was not, we think, as large as it would have been if it had accorded in every respect with Mrs. Hatcher's supposition.

We cannot set aside the deed for fraud, unless we are well satisfied, not only that Hatcher made false statements to his wife, but that she was induced thereby to join in the deed when she would not otherwise have done so. The evidence fails to satisfy us that she would have refused, taking her own testimony as to what was said to her, and how the transaction presented itself to her at that time.

Several witnesses, parties in interest or members of their families, were introduced who testified to what they heard Mrs. Day say about the deed. But Mrs. Day, if she had been present when the deed was executed, could not have known more in regard to the statements made to Mrs. Hatcher to procure her signature than Mrs. Hatcher herself knew. It is unnecessary, therefore, for us to review the testimony of these witnesses.

In our opinion no fraud was practiced upon Mrs. Hatcher, in procuring her signature to the deed.

II. Was her signature to the deed of the hotel property to Elijah Hatcher procured by fraud?

This transaction was ostensibly a sale, and not a gift. It was represented to Mrs. Hatcher as a sale, and she joined in the deed upon that supposition. If it was not a sale in fact, but a gift; her signature was obtained under a false pretence, and her dower, we think, is not barred. Upon this point the testimony of a large number of witnesses was taken, mostly parties in interest or members of their families, and related to each other by blood or marriage, and we have to say that there is a most painful conflict. We cannot within the proper limits of an opinion go into a detailed examination of it.

It shows that at the time of the execution of this deed an

alienation had sprung up, not only between Mrs. Hatcher and her husband, but between her and her husband's children, though it was not of a very marked character. We are satisfied that not only her husband, but his children, conceived the idea that, while she was entitled to support during her life, she ought not be allowed to convey or transmit Hatcher property to strangers. This fact of course would not prove that they conspired to defraud her, but it is a circumstance not to be ignored, while we endeavor to ascertain the truth from evidence so conflicting.

The consideration expressed in the deed to Elijah was seven thousand dollars. According to the trade, as ostensibly made, one thousand was to be paid down. Elijah testifies that it was paid down. If so, it would tend to show that the transaction was a sale. What the fact is in regard to such payment we are not able clearly to determine. For the balance of the purchase money Elijah gave his six notes for one thousand dollars each, payable, without interest, in one, two, three, four, five and six years. The rents of the property amounted to about one thousand dollars a year. The evidence, as we understand it, shows that during the first four years the rents were a little more than sufficient to pay the first four notes. What the rents were afterward does not clearly appear. If the understanding was that the first six years' rent would pay the six notes, such fact would be a circumstance tending to support Mrs. Hatcher's theory that the transaction was largely in the nature of a gift.

But she is not without direct evidence upon this point. If the transaction was designed as a gift to some extent, it was not, as appears from the evidence, designed wholly as a gift to Elijah, but to him and at least a portion of the other children. The first witness introduced to show that it was a gift was W. F. Hatcher. He testified in substance that after his father's death Elijah told him that he had some money in the house; that if he could sell it and get his money out he would divide the rest among the heirs, or all but Joe, Sam

and Gregg, who he claimed had had their share of the Hatcher estate. The same witness testified that Elijah claimed that he obtained title to the hotel as a kind of security against some indorsements which he had made for his father; also that Elijah stated that he was to pay the notes with the rents, and that if any trouble arose with Mrs. Hatcher he was to have the notes.

Mrs. W. F. Hatcher corroborates her husband to some extent.

M. A. Hatcher testifies that Elijah said that he held the hotel property in trust for the benefit of the children.

J. G. Hatcher testifies that Elijah did not claim to own the hotel, but to hold it in trust for the children. He also testifies that Elijah stated to him that "it did not make any difference what amount he gave his notes for, as it was only a blind anyhow."

All this testimony as to taking the property in trust to any extent is contradicted by Elijah, who gives a clear and detailed statement of the transaction by which he acquired title, showing, if he is to be believed, that the transaction involved nothing of a gift to himself or any one else. But the preponderance of the testimony is so greatly against him we feel constrained to hold that the transaction was not wholly what it was represented to Mrs. Hatcher to be. Possibly the agreement between Elijah and his father was not very well defined. It may be that it was left open to some extent, or shifted from time to time. We think it quite probable that Elijah had become surety for his father, as he claimed, and that he needed the title to the property for his protection, and also that he was to hold it for whatever he advanced upon the strength of it. Still we are satisfied that one of the motives of Elijah and his father was to secure a release of Mrs. Hatcher's dower right for the benefit of the children. If in securing such release they knowingly misled her, as we believe they did, her dower is not barred.

III. We now proceed to consider the rights of the plaintiffs other than Mrs. Hatcher. They claim that both the property conveyed to Mrs. Day and the property conveyed to

Elijah were conveyed in trust for all the children except Joseph and Samuel, and that the deeds should be set aside and an account taken of the different advancements, and the property divided accordingly. Some evidence tending to show admissions of a trust by Mrs. Day was introduced, as well as evidence of admissions of a trust by Elijah.

It appears to us that at the time of the execution of the deed to Mrs. Day her father intended the property wholly as an advancement to her; that afterward the property enhanced in value, while his own estate became considerably impaired. We think there was talk of a more equitable division. But we find nothing either in the averments of the petition or the evidence upon which the plaintiff heirs can be granted relief.

Their remedy, if they had any, would not be to procure a cancellation of the deeds, but an enforcement of the trusts. They do not, upon their own theory, become entitled to the property as heirs, but as beneficiaries under the trust conveyances. Whatever fraud might have been practiced upon Mrs. Hatcher, there was none practiced upon Mr. Hatcher. He made precisely the disposition of the property which he intended, and if he intended anything for the benefit of the children it was not intended by him that the deeds should be set aside, but that they should take through the deeds in the execution by the grantees of the trust agreements, which, it is alleged, were entered into by them. Now the petition is not only not framed upon the theory of enforcing a trust, there being no such prayer, and no trust being averred in terms sufficiently definite to enable a court to enforce it, but the evidence as to the terms of the trust is wholly insufficient. We could not make an equal division in the absence of any averment or proof that that was the agreement. Besides, the plaintiffs do not ask such division.

Having reached a conclusion adverse to them we have no need to determine whether such a trust could be proven by parol testimony, which is the only evidence introduced by the plaintiff heirs to prove it.

We think that Mrs. Hatcher is entitled to dower in the hotel property, but not in the property conveyed to Mrs. Day. Upon the plaintiffs' appeal, then, and upon Elijah Hatcher's appeal, the judgment is affirmed. Upon Mrs. Day's appeal the judgment is

REVERSED.